UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

AUTO DATA DIRECT, INC.,
a Florida for Profit Corporation,

Plaintiff,

v.                                                    Case No.: 4:26-cv-00039-AW-MAF

POSTR, LLC., a Foreign Limited Liability
Company, LEE PERINE, individually,
YOTTA AUTOMATED SOFTWARE
SOLUTIONS, INC., a Foreign for Profit
Corporation, ROBERT RIEGER, individually,

Defendants.

_____/

**PLAINTIFF AUTO DATA DIRECT'S RESPONSE TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED COMPLAINT AND
INCORPORATED MEMORANDUM OF LAW**

Plaintiff, AUTO DATA DIRECT, INC., by and through the undersigned

counsel, hereby responds to Defendants POSTR, LLC, LEE PERINE, YOTTA

AUTOMATED SOFTWARE SOLUTIONS, INC., and ROBERT REIGER's

Motion to Dismiss the Second Amended Complaint, and states as follows:

**INTRODUCTION**

At its core, this matter involves a conspiracy to commit corporate espionage

by the Defendants. Plaintiff AUTO DATA DIRECT, INC. (hereinafter "ADD") is a

provider of digital services that connects qualified business entities such as towing

companies, automobile dealers, automobile tag agencies, government entities,

attorneys, financial institutions, and insurance companies with the departments of motor vehicles in 45 states. This connection allows these business entities to quickly and accurately obtain motor vehicle data for their lawful business purposes within a matter of seconds. Access to ADD's programs is limited solely to those qualified business entities pursuant to the dictates of the federal Driver's Privacy Protection Act, 18 U.S.C. § 2721, et. seq. ADD requires that each of these entities enter into an Electronic Records Account Agreement and accept ADD's Terms of Use, which require that the entity maintain compliance with the law and prohibit any entity from modifying, creating a derivative work of, reverse engineering, reverse assembling, or otherwise attempting to discover any source code of ADD's software. In 2022, Defendant Perine, who revived the then-dormant Postr, LLC, applied to access to ADD's DMV123 system for the sole purpose and intent of reverse engineering the software and creating a derivative work. This goal was the result of a conspiracy between the corporate entities and individual actors, Defendants Perine and Robert Rieger, who were both officers of YOTTA AUTOMATED SOFTWARE SOLUTIONS, INC. ("YASSI") at the time. These Defendants intentionally and fraudulently accessed ADD's system and then used the information gained through that access to create for YASSI a virtually identical product, which YASSI then began to market and sell to ADD's customers.

On November 4, 2025, ADD filed suit against the Defendants in Leon County, Florida for breach of contract, civil conspiracy, violation of the Florida Uniform Trade Secrets Act, tortious interference with business relationships, fraudulent misrepresentation, and violation of the Florida Deceptive and Unfair Trade Practices Act. On November 25, 2025, prior to service of the complaint, ADD filed a First Amended Complaint, which added some jurisdictional allegations to paragraph 10 and made minor corrections. No substantive adjustments were made. The case was then served on Defendants and eventually removed to this Court on January 22, 2026 with the cooperation of the parties. After discussions with defense counsel, who requested that ADD clarify the allegations in its civil conspiracy claim, ADD filed a Second Amended Complaint, which clarified the specific counts and tort claims upon which the conspiracy claim was based. No other substantive changes were made, and such changes were made at the request of the Defendants. Defendants then filed the instant Motion to Dismiss on March 3, 2026. In the motion, Defendants argue (1) that ADD failed to identify the business relationships with which the Defendants interfered or how Defendants interfered with those relationships, (2) that ADD's claims for civil conspiracy, tortious interference, fraudulent misrepresentation, and FDUTPA claims are preempted by Florida's Uniform Trade Secrets Act, (3) that ADD has failed to allege it possessed a trade secret, and (4) that

ADD failed to plead its FDUTPA claim with particularity.[1] For the reasons discussed herein, Defendants' motion must be denied.

<u>**MEMORANDUM OF LAW**</u>

**I.      STANDARD OF REVIEW**

A complaint may be dismissed under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." However, Federal Rule of Civil Procedure 8(a) requires that a claim for relief need only contain "a *short* and *plain* statement of the claim showing that the pleader is entitled to relief." (emphasis added). "Because the Federal Rules embody the concept of liberalized 'notice pleading,' a complaint need contain only a statement calculated to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *U.S. v. Baxter Int'l, Inc.,* 345 F.3d 866, 881 (11th Cir. 2003) (internal quotation omitted). "[T]he threshold of sufficiency to which a complaint is held at the motion-to-dismiss stage is exceedingly low." *Id.* "The moving party bears the burden to show that the complaint should be dismissed." *Mendez-Arriola v. White Wilson Med. Ctr. PA*, No. 3:09CV495/MCR/EMT, 2010 WL 3385356, at *3 (N.D. Fla. Aug. 25, 2010) (Rodgers, J.).

---

[1] Defendants also argue that there is no basis for the recovery of attorney's fees under Plaintiff's claims for breach of contract, civil conspiracy, tortious interference, or fraudulent misrepresentation. Plaintiff concedes that there is no statutory or contractual basis for the recovery of attorney's fees under these claims.

A complaint need not set forth detailed factual allegations so long as the allegations "raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). "Determining whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense," *id.* at 679, and "pleadings must be construed so as to do justice." Fed. R. Civ. P. 8(e).

## II.    ADD HAS ADEQUATELY PLED A CLAIM FOR TORTIOUS INTERFERENCE.

"There are four elements of tortious interference with a business relationship: '(1) the existence of a business relationship... (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.'" *Swope Rodante, P.A. v. Harmon*, 85 So. 3d 508, 509 (Fla. 2d DCA 2012) (quoting *Ethan Allen, Inc. v. Georgetown Manor, Inc.,* 647 So. 2d 812, 814 (Fla. 1994)).

"Claims for tortious interference do not have to be pled with specificity." *Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 527 F. Supp. 2d 1355, 1368 (M.D. Fla. 2007) (citing *Proctor & Gamble, Co. v. Haugen*, 222 F.3d 1262, 1279 (10th Cir. 2000) (tortious interference with business relationship claims must be pled in accordance with federal standard set forth in Fed. R. Civ. P. 8(a))). "Under the Federal Rules a plaintiff is only required to include 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

### A.    ADD adequately pled the existence of a business relationship.

ADD's Second Amended Complaint states that ADD's "core business is to provide real-time motor vehicle inquiry solutions *to qualified companies* under the Federal Driver's Privacy Protection Act (DPPA) that need automobile information to conduct daily business operations." 2d Am. Compl., ¶ 12 (emphasis added). "ADD offers access only to commercial entities who present evidence of a legitimate purpose for use of the data…" *Id.*, ¶ 13. These "qualified companies" include: "towing companies, automobile dealers, automobile tag agencies, government entities, attorneys, financial institutions, and insurance companies." *Id.*, ¶¶ 14, 20. The Second Amended Complaint expressly alleges that "YASSI began approaching *ADD customers and clients* and offering to provide them" a "nearly identical" product. *Id.*, ¶ 37 (emphasis added). *See also id.*, ¶¶ 40, 41 (referencing ADD

customers). ADD's tortious inference claim identifies these business relationships as "including but not limited to ADD's business relationships with *specific* and *certain* third-party insurance companies," [2] which will be identified through discovery. *Id.*, ¶ 92 (emphasis added). Thus, these allegations give the Defendants "fair notice of what the plaintiff's claim is" and the relationships "upon which it rests." *Baxter,* 345 F.3d at 881 (internal quotation omitted).

In *Pediatric Nephrology Associates of South Florida v. Variety Children's Hospital*, the court held that the plaintiffs sufficiently stated a plausible claim for tortious interference with advantageous professional relationships despite the defendant's argument that the relationships at issue were not specifically identified. 226 F. Supp. 3d 1346, 1357-58 (S.D. Fla. 2016). There, a pediatric nephrology practice group at a hospital filed suit against a pediatric physician practice group, the hospital, and its former partner, alleging a conspiracy to take control and monopolize physician groups that were practicing at the hospital. *Id.* at 1349-1351. After the nephrology group refused to join the pediatric physician group, the group initiated a campaign of retaliation, instructed other physicians not to refer patients to the nephrology group, and concocted a scheme to evict the partnership from the hospital. *Id.* at 1350.

---

[2] Plaintiff did not specifically name these insurance companies within the complaint given the nature of the issues and in the interest of protecting Plaintiff's trade-secret customer list.

The defendants argued that the plaintiff failed to state a claim for tortious interference because they failed to allege the identity of any patients or independent physicians with whom the nephrology group had business relations. *Id.* at 1357. The court disagreed, finding that the allegations that merely identified that the business relationship at issue were the nephrology group partners' professional relationships with other doctors practicing at the hospital were sufficient: "The Court agrees with Plaintiffs that they have sufficiently stated a plausible claim for tortious interference with advantageous professional relationships. The Court is unaware of any case law that would require Plaintiffs to specifically allege the identity of the patients and/or independent physicians at this stage…" *Id.* at 1357-58. Here, ADD has alleged that Defendants interfered with its customers and "specific and certain third-party insurance companies." 2d Am. Comp., ¶ 92. This allegation alone is sufficient.

ADD is not alleging that Defendants interfered with its relationships with the "public at large." ADD's product is not marketed to the general public and may only be accessed by specific, qualified companies. *Ethan Allen, Inc. v. Georgetown Manor, Inc.* is distinguishable for this reason, as the plaintiff there was the operator of a furniture outlet which any member of the public could simply walk into and shop, and the plaintiff alleged that the defendant interfered with its "prospective relationship" with thousands of past customers. 647 So. 2d at 814. Rather than holding that the plaintiff's claim failed because it failed to specifically identify the

relationships with which the defendant interfered, the court simply held that the plaintiff's "relationship with its past customers was not one upon which a claim for tortious interference could be based" because "the mere hope that some of its past customers may choose to buy again cannot be the basis for a tortious interference claim." *Id.* at 815.[3]

Here, the nature of ADD's business involves *ongoing* and *continuous* contractual relationships with specific qualified business entities that maintain access to its system, which is far different than any "potential relationship" with the public at large.[4] *See also Hill Dermaceuticals, Inc. v. Anthem, Inc.,* 228 F. Supp. 3d 1292, 1301 (M.D. Fla. 2017) ("[A]lthough a business's relationship with a past customer is not a protected relationship, an ongoing relationship with a current customer or a potential relationship with a future customer may be protected."); *VPNetworks, LLC v. Collective 7, Inc.*, No. 6:19-cv-1179, 2019 WL 13168768, at *3 (M.D. Fla. Sept. 10, 2019) (allegation that the interference caused hundreds of cancellations of orders sufficient; "An order cancellation necessarily implies an

---

[3] The court *did* hold, however, that plaintiff's claim could proceed with its claim that the defendant interfered with its relationships with customers who had *existing* orders with it. *Id.*

[4] The Court in *Ethan Allen* also distinguished the case of *Insurance Field Services, Inc. v. White & White Inspection & Audit Service, Inc.*, 384 So. 2d 303 (Fla. 5th DCA 1980), on this basis, noting that in *White*, "a company had been regularly performing underwriting inspections, premium audits, and loss control work for sixteen insurance company clients" and "[t]he ongoing relationship with which the tortfeasor interfered there was far different than the one maintained by a retail furniture dealer with 89,000 past customers." 647 So. 2d at 815 n.1.

existing, identifiable relationship."). Accordingly, ADD has sufficiently alleged the existence of business relationships with which the Defendants interfered.

### B. ADD adequately pled Defendants' knowledge of the business relationship.

ADD's Second Amended Complaint states: "Defendants, acting in concert and with a common goal and purpose, had knowledge of those relationships, including but not limited to ADD's business relationships with specific and certain third-party insurance companies." 2d Am. Comp., ¶ 92. ADD's Complaint alleged that "YASSI began approaching ADD customers and clients and offering to provide them with a Motor Vehicle data product virtually identical to the ADD product at a lower price than offered by ADD." *Id.*, ¶ 37.

Defendants knew that ADD had customers and knew the types of businesses those customers were engaged in, as entities authorized under the DPPA to access such data. Defendants cannot now claim that it had no idea ADD has relationships with these types of entities. "As the Eleventh Circuit has noted, however, the knowledge element need not be pleaded with specificity. Tortious interference claims are not subject to a heightened pleading standard, and Rule 9 allows knowledge to be alleged generally, so those elements can survive motions to dismiss even when the allegations are short on detail." *Euclid Turnaround Opportunity Fund LP v. Amerant Equip. Fin.*, No. 25-CV-20647, 2025 WL 3905174, at *24 (S.D. Fla.

Oct. 6, 2025), *report and recommendation adopted*, 2026 WL 73822 (S.D. Fla. Jan. 9, 2026) (internal citations omitted).[5]

In *Congruex, LLC v. CCU, LLC*, the Southern District of Florida very recently held that knowledge allegations similar to the allegations here were enough to survive a motion to dismiss. No. 25-cv-23055, 2026 WL 607613, at *7 (S.D. Fla. Mar. 4, 2026). There, the plaintiffs alleged that the defendants engaged in coordinated and repeated efforts to obtain the plaintiffs' confidential and trade secret information and asserted a claim for tortious interference with a contract, among other claims. *Id.*, at *1. The defendants moved to dismiss the claim, arguing in part that the plaintiffs did not adequately allege that the defendants knew about the agreement. *Id.*, at *5. The court rejected this argument, stating that "[a] plaintiff doesn't need to allege a defendant's knowledge of a contract with specificity for a tortious-interference claim to survive Rule 12(b) dismissal." *Id.*, at *7. *See also Sun*

---

[5]Defendants cited several cases which involved tortious inference with *contractual* relationships. *See, e.g., Sekula v. Residential Credit Solutions, Inc.*, No. 6:15-cv-2104, 2016 WL 4272203 (M.D. Fla. Aug. 15, 2016); *Dynasty Mgmt., LLC v. UMG Recordings, Inc.*, 759 Fed. Appx. 784 (11th Cir. 2018). Claims for tortious interference with a *business* relationship and claims for interference with a *contractual* relationship differ in that in an action for interference with a business relationship, the relationship need not be evidenced by a formal or enforceable contract, whereas claims for interference with a contractual relationship do. *Smith v. Ocean State Bank*, 335 So. 2d 641, 642 (Fla. 1st DCA 1976); *Pilkington v. United Airlines, Inc.*, 921 F. Supp. 740, 749 (M.D. Fla. 1996); *Barquin v. Monty's Sunset, L.L.C.*, 975 F. Supp. 2d 1309, 1315 (S.D. Fla. 2013); *Hill Dermaceuticals, Inc.*, 228 F. Supp. 3d at 1301. Thus, stronger allegations are typically needed where a plaintiff alleges interference with a *specific contractual relationship*, rather than interference with a group of business relationships.

*Life Assurance Co. of Can. v. Imperial Premium Fin., LLC,* 904 F.3d 1197, 1215 (11th Cir. 2018) (same).[6]

Accordingly, by alleging that YASSI had knowledge of its relationships, "including but not limited to ADD's business relationships with specific and certain third-party insurance companies," ADD has adequately pled knowledge.

### C. ADD adequately pled Defendants' intentional and unjustified interference with ADD's business relationships.

ADD's Second Amended Complaint is replete with allegations asserting Defendants' intentional and unjustified interference and *how* they interfered. For example, ADD pled that "Defendants, acting in concert and with a common goal and purpose, intentionally and unjustifiably interfered with those business relationships *through replicating and reverse engineering ADD's DMV123 software/system and fraudulently obtaining ADD's proprietary pricing and then marketing to ADD's customers YASSI's misappropriated system as identical to ADD's and at a lower price than ADD's proprietary program/system."* 2d Am. Comp., ¶ 93 (emphasis

---

[6] Decisions from other jurisdictions are also instructive. *See Verkin v. Melroy*, 699 F.2d 729, 733 (5th Cir. 1983) (applying Texas law, finding that knowledge of specific identity of business relationship not required; "all that is necessary is that the tortfeasor know that *some* party or parties had a prospective contractual relationship" (emphasis in original)); *Teitel v. Wal-Mart Stores, Inc.*, 287 F. Supp. 2d 1268, 1281 (M.D. Ala. 2003) (applying Alabama law; "The tort of interference with prospective contractual relations does not require that a tort-feasor have knowledge of a specific third person whom its misconduct prevented from entering into a business relation with the plaintiff."); *Kelly-Springfield Tire Co. v. D'Ambro*, 596 A.2d 867, 871 (Pa. Super. 1991) (applying Pennsylvania law; "Neither case law nor Section 766B of the Restatement (Second) of Torts, which purports to define the tort of interference with a prospective contractual relation, requires an averment that the tortfeasor have knowledge of a specific third person whom its conduct prevented from entering a business relationship with the plaintiff.").

added). These allegations could not be clearer. Thus, Defendants' argument that the complaint fails to allege "how, specifically, ADD interfered" is wholly without merit.

## III.    THE FLORIDA UNIFORM TRADE SECRETS ACT DOES NOT PREEMPT ADD'S CLAIMS.

Although section 688.008 of Florida's Uniform Trade Secrets Act (FUTSA) provides that the Act displaces "conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret," this section also provides that the Act does *not* affect "contractual remedies, whether or not based upon misappropriation of a trade secret," or "other civil remedies that are not based upon misappropriation of a trade secret." Fla. Stat. § 688.008. "[I]f the allegations of trade secret misappropriation *alone* comprise the underlying wrong, only the FUTSA claim will survive the motion to dismiss." *Am. Honda Motor Co., Inc. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1181 (M.D. Fla. 2005) (emphasis in original). Here, ADD's civil conspiracy, tortious interference, fraudulent misrepresentation, and FDUTPA claims go beyond the misappropriation of a trade secret and are thus not preempted.

At the outset, a decision as to whether ADD's claims are preempted by the FUTSA is premature at this stage. As this Court has previously observed, "[t]he existence of an affirmative defense such as preemption will not usually support a motion to dismiss." *Reynolds v. Wal-Mart Stores, Inc.*, No. 4:14CV381-MW/CAS,

2015 WL 1879615, at *3 (N.D. Fla. Apr. 23, 2015) (Walker, J.). In addition, Defendants contest whether ADD's technology is a trade secret under the FUTSA. If ADD's technology is ultimately found not to be a trade secret, ADD's tort claims are not preempted. Thus, at this motion to dismiss stage, "it would be hasty" to dismiss the claims because this Court "may determine that FUTSA doesn't even apply." *Congruex*, 2026 WL 607613, at *7 (noting that the defendants' preemption argument was better suited for summary judgment). *See also CHG Med. Staffing, Inc. v. Shafer*, No. 23-61703-CIV, 2024 WL 4881026, at *7 (S.D. Fla. Jul. 31, 2024) ("[I]n the event that [plaintiff's] misappropriation claims are to be dismissed at a later date, [plaintiff's] conversion claim would no longer be preempted," and "[s]ince the Federal Rules of Civil Procedure encourage alternative pleadings… it would be premature for the Court" to dismiss plaintiff's conversion claim.); *VPNetworks*, 2019 WL 13168768, at *3 (until there has been a determination regarding whether the misappropriated information constitutes trade secrets, plaintiff is permitted to maintain tortious interference and other statutory claims in the alternative); *Healthcare Appraisers, Inc. v. Healthcare FMV Advisors, LLC*, No. 10-80293-CIV, 2011 WL 4591960, at *10 (S.D. Fla. Sept. 30, 2011) (preemption argument is more properly asserted at summary judgment because if it is determined that there are no trade secrets, then unjust enrichment claim would not be based on misappropriation of trade secrets and not displaced).

Although some courts have held that preemption applies even where the information does not ultimately qualify as a trade secret,[7] a finding that such an argument is premature at the motion to dismiss stage is the better approach. As noted recently by the court in *Hernandez v. Stingray Group, Inc.*, none of those decisions are binding, and the position those decisions take is not the "most accurate interpretation of FUTSA":

> [T]he Court can certainly imagine a scenario where Plaintiffs' unjust enrichment claim is preempted, but then Plaintiffs cannot prove that all of their confidential and proprietary information constitutes a "trade secret." Plaintiffs would then be left with no recourse because their unjust enrichment claim was prematurely dismissed.
>
> We find *Healthcare Appraisers*[, 2011 WL 4591960,] to be the more sensible and accurate approach, and thus recommend that the more appropriate course of action is to permit Plaintiffs' unjust enrichment claim to proceed past this Motion to Dismiss. Then, after discovery, the parties can hash out with a more developed record which of Plaintiffs' confidential and proprietary information constitutes a trade secret. That way, the Court avoids the problem of Plaintiffs' confidential and proprietary information not being deemed a trade secret; Plaintiffs having no recourse under FUTSA; and Plaintiffs also having no recourse through unjust enrichment because their claim was prematurely dismissed.

---

[7] *See Am. Registry, LLC v. Hanaw*, No. 2:13-cv-352, 2014 WL 12606501, at *5 (M.D. Fla. July 16, 2014); *Vape Fiends, Inc. v. Lightfire Grp., LLC*, No. 17-60951-CIV, 2017 WL 5953429, at *3 (S.D. Fla. Aug. 21, 2017); *K3 Enters., Inc. v. Sasowski*, No. 20-24441-CIV, 2021 WL 8363506, at *9 (S.D. Fla. Nov. 22, 2021).

No. 24-CV-21226, 2025 WL 1047138, at *10 (S.D. Fla. Mar. 4, 2025), *report and recommendation adopted*, 2025 WL 938516 (S.D. Fla. Mar. 28, 2025) (internal citations omitted).[8]

Even if this argument were not premature, ADD's claims are not preempted. ADD's claims for civil conspiracy, tortious interference, fraudulent misrepresentation, and FDUTPA claims allege wrongdoing beyond misappropriation of trade secrets alone. ADD alleged: "The Defendants acted knowingly and in concert and aided and abetted each other in the overall scheme to *defraud ADD*, misappropriate ADD's trade secrets, *interfere with ADD's business relationships, and falsely advertise and misrepresent the YASSI competing product* as set forth in paragraphs 1-42 and within Counts III, IV, V, and VI." 2d Am. Comp., ¶ 58 (emphasis added). ADD's tortious interference claim (Count IV) alleges that in addition to misappropriating ADD's system, it also fraudulently obtained ADD's proprietary pricing and fraudulently mispresented to ADD customers that YASSI's system was identical to ADD's. 2d Am. Comp., ¶ 93. ADD's fraudulent misrepresentation claim (Count V) alleges that Defendants made a series of misrepresentations and fraudulent statements to induce ADD to allow them access to ADD's system. 2d Am. Comp., ¶¶ 97-101. ADD's FDUTPA claim (Count VI) relies entirely on Defendant's misrepresentations to ADD's customers that YASSI's

---

[8] Federal circuits courts have not yet addressed this issue.

product is identical or superior, which it is not as set forth in Section V below. 2d Am. Comp., ¶¶ 106-108.

Even though some these claims might involve misappropriation of trade secrets, "the core of [these claims] is *not* the misappropriation of trade secrets… but rather, Defendant[s'] alleged *use* of the trade secrets to interfere with Plaintiff['s] business relationship[s]… therefore, the basis of the claim[s] stem[] from an independent factual basis" and are not preempted by the FUTSA. *777 Partners LLC v. Pagnanelli*, No. 20-20172-CIV, 2022 WL 4597804, at *10 (S.D. Fla. Mar. 16, 2022) (finding claims for tortious interference with contract and breach of fiduciary duty were not preempted by FUTSA claim) (emphasis added). *See also Audiology Distrib., LLC v. Simmons*, No. 8:12-cv-02427, 2014 WL 7672536, at *10 (M.D. Fla. May 27, 2014) ("[T]he crux of [the tortious interference claim] is not the misappropriation of trade secrets, but the use of that information to interfere with [plaintiff's] business relationships."); *Paragon Ins. Holdings, LLC v. Phillips*, No. 2:25-cv-54, 2025 WL 1370178, at *2 (M.D. Fla. May 12, 2025) ("The crux of Plaintiff's claim is Defendant's solicitation and his scheme to unfairly compete. Thus, the alleged use of Plaintiff's trade secrets is a subsidiary allegation in support of Plaintiff's claim, not its main factual basis.").[9] Here, "Plaintiff alleges its stolen

---

[9] *Cf. Digiport, Inc. v. Foram Dev. BFC, LLC*, 314 So. 3d 550, 553-54 (Fla. 3d DCA 2020) (FUTSA preempted claim for *misappropriation* of a business idea); *Mortgage Now, Inc. v. Stone*, No. 3:09-cv-80, 2009 WL 4262877, at *8 (N.D. Fla. Nov. 24, 2009) (Rodgers, J.) (FUTSA preempted claim for *civil theft* of customer leads and mortgage applications).

trade secrets were merely a tool Defendant[s] employed to facilitate [their] tortious conduct—soliciting Plaintiff's customers and colluding to unfairly complete," and thus, these claims are not preempted. *Paragon*, 2025 WL 13070178, at *2.

In *New Lenox Industries, Inc. v. Fenton*, the court held that the plaintiff's claim for fraudulent inducement was not preempted by its FUTSA claim under similar circumstances:

> The Court concludes that the claims, as pled, are distinct. The crux of Plaintiff's fraud in the inducement claim is that Fenton misled Plaintiff into believing that NLI's technology was being evaluated by an independent industry expert, rather than by a potential competitor, in order to obtain access to Plaintiff's confidential proprietary information. In contrast, the gist of Plaintiff's misappropriation of trade secret claim under FUTSA is that Defendants disclosed the unlawfully obtained trade secrets to others in the airbag industry and utilized the information to compete with Plaintiff.

510 F. Supp. 2d 893, 907-08 (M.D. Fla. 2007). Here, ADD's fraudulent misrepresentation claim alleges that Defendants "made a series of misrepresentations to ADD in an effort to induce ADD to approve the qualification verification process, and allow Postr and Perine to become Authorized Subscribers and access the DMV123 software/system." 2d Am. Comp., ¶ 97. The gist of ADD's FUTSA claim, on the other hand, is that Defendants "*stole* ADD's DMV123 product by accessing, using, copying, reengineering, and reverse engineering the source code without ADD's consent..." 2d Am. Comp., ¶ 76 (emphasis added).

In *Hytto Pte. Ltd. v. Olivaresii*, a Middle District of Florida court very recently held that the plaintiff's FDUTPA claim was also not preempted by the FUTSA:

> Lovense's FDUTPA claim rests on a broader story: that Olivaresii took the company's confidential information and weaponized it "in the marketplace in conjunction with misleading statements about his role" to squeeze an advantage out of Lovense's own customers and business partners. (Doc. 92 at 36.) A FUTSA claim, by contrast, targets a much narrower wrong. It is limited to "[d]isclosure or use of a trade secret of another without express or implied consent." Fla. Stat. § 688.002(2)(b). It does not encompass misleading Lovense's consumers and business partners and using confidential information—that may or may not include trade secrets—to do so. Because the FDUPTA claim remedies a different set of harms, preemption does not apply here.

No. 2:25-cv-576, 2026 WL 764088, at *3 (M.D. Fla. Mar. 18, 2026). *See also XTec, Inc. v. Hembree Consulting Servs., Inc.,* 183 F. Supp. 3d 1245, 1263-64 (S.D. Fla. 2016) (where plaintiff clarified that it was the *manner* in which the defendants gained access to trade secrets for purposes of FDUTPA claim, such assertion was sufficient to materially distinguish that claim from the FUTSA claim); *Am. Honda*, 390 F. Supp. 2d at 1181 (FDUTPA, fraud, and negligent misrepresentation claims not preempted where the claims were based on false representations that induced the claimant to divulge its information, to conduct further research, and forego other business relationships). Because each of ADD's claims rest on a "broader story" that goes well beyond the "disclosure or use of a trade secret," none of ADD's claims are preempted. And, as this Court has previously noted, "[t]ypically, FDUTPA claims are not preempted because they require the extra element of an unfair or deceptive

trade practice." *Kmet v. Discovery Commc'ns, LLC*, No. 4:16CV565-MW/CAS, 2017 WL 11672822, at \*4 (N.D. Fla. Nov. 30, 2017) (Walker, J.).

Although Defendants also cited *Allegiance Healthcare Corp. v. Coleman*, the court in that case evaluated FUTSA preemption in a somewhat conclusory manner in a case involving a claim of unfair competition. 232 F. Supp. 2d 1329, 1335-36 (S.D. Fla. 2002). The court cited only one Missouri district court case applying Florida law, which noted the lack of Florida jurisprudence on the statute at that time. *Id.* at 1335 (citing *Coulter Corp. v. Leinert*, 869 F. Supp. 732, 734 (E.D. Mo. 1994)). Fifteen years later, in *Advice Interactive Group, LLC v. Web.com Group, Inc.*, the Middle District of Florida distinguished *Coleman*, noting that in *Advice Interactive Group,* the plaintiff identified "material distinctions between the wrongdoings alleged in its trade secret misappropriation claim and its FDUTPA claim," including that "AIG allege[d] that Web.com induced AIG to give Web.com its trade secrets, intended to misuse the secrets in violation of the Non-Disclosure Agreements, signed the Service Agreement and Non-Disclosure Agreements while Web.com simultaneously developed Ignite to compete with AIG." No. 3:17-cv-801, 2017 WL 6554409, at \*11 (M.D. Fla. Oct. 20, 2017). Thus, the court concluded that "Web.com's alleged inducement, intention to breach the Non-Disclosure Agreements, and simultaneous development of Ignite distinguish AIG's FDUTPA

claim from its trade secret misappropriation claim." *Id.*[10] ADD's allegations here are very similar to the allegations in *Advice Interactive Group*, and this Court should find that ADD's tort claims are not preempted by the FUTSA, at least at this stage of the litigation.

## IV.   ADD HAS ADEQUATELY PLED A CLAIM UNDER THE FLORIDA UNIFORM TRADE SECRETS ACT

### A.   Whether something is a trade secret is a question of fact and a matter of proof, not pleading.

Florida's Uniform Trade Secrets Act defines a "trade secret" as "information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainably by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Fla. Stat. § 688.002(4).

---

[10] Defendants also cited *Al Rushaid Petroleum Investment Co. v. Siemens Energy Inc.,* claiming that the court therein affirmed dismissal of the plaintiff's unfair competition claim for being insufficiently distinct from a trade secret claim. 159 F.4th 887, 898 (11th Cir. 2025). The court in fact affirmed dismissal of that claim because it was an "impermissible shotgun pleading," not that it was preempted by the FUTSA as a matter of law. *Id.  Freedom Mortgage Corp. v. Strong Home Mortgage, LLC* is also distinguishable in that the plaintiff's civil conspiracy claim was based entirely on the defendants' conspiracy with the plaintiff's former employees to violate their fiduciary duty and obtain the plaintiff's trade secrets. No. 20-81721-CV, 2020 WL 8642053, at *4 (S.D. Fla. Dec. 15, 2020).  As to the FDUTPA claim, the court dismissed the claim "based on the facts of [that] case," which involved the defendants' efforts to misappropriate the plaintiff's trade secrets. *Id*. Here, however, Plaintiff's FDUTPA claim is not based at all on Defendants' misappropriation of trade secrets, but rather, Defendants' misrepresentations to ADD's clients as to what YASSI's program could do. *See Section V below*.

ADD's Second Amended Complaint alleges: "ADD's DMV123 has a unique combination of processes designed to produce streamlined data about state DMV motor vehicle registration, title and driver's license information, in addition to providing a link to NMVTIS data and a unique bar code verification system allowing the user to validate the data obtained." 2d Am. Comp., ¶ 64. The Second Amended Complaint also alleges that "ADD's DMV123 software/system was designed and developed to conduct motor vehicle transactions in 'real-time' using the ADD's computer interface for a permissible use," and "also allows the user access to ADD's proprietary pricing for its products and system." *Id.*, ¶¶ 62, 65.[11]

Whether ADD's DMV123 software/system constitutes a trade secret is a question of fact. *Digiport*, 314 So. 3d at 553. *See also Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1410-11 (11th Cir. 1998) ("Whether a particular type of information constitutes a trade secret is a question of fact."); *All Pro Sports Camp, Inc. v. Walt Disney Co.*, 727 So. 2d 363, 368 (Fla. 5th DCA 1999) ("Whether an idea is novel, or not generally known, is a factual question."); *Treco Intern. S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1286 (S.D. Fla. 2010) (same).

---

[11] Plaintiff also alleges that its Electronic Records Account Agreement, Terms of Use, and User Registration Form are also trade secrets. 2d Am. Comp., ¶ 63.

"The law is clear that questions of fact cannot be resolved on motions to dismiss because the court must accept the plaintiff's allegations of the plaintiff's complaint as true." *Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1293 (S.D. Fla. 2001). Even where the issue is presented at summary judgment, "[c]ourts are extremely hesitant to grant summary judgment regarding the fact-intensive questions of the existence of a trade secret or whether a plaintiff took reasonable steps to protect its trade secrets." *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1141 (M.D. Fla. 2007). "The term 'trade secret' is one of the most elusive and difficult concepts in the law to define. The question of whether an item taken from an employer constitutes a 'trade secret,' is of the type normally resolved by a fact finder after full presentation of evidence from each side." *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288-89 (5th Cir. 1978). "Accordingly, on a motion to dismiss, the movant must present '*clear authority*' that the information the plaintiff identifies is not protected." *Coleman*, 232 F. Supp. 2d at 1335 (citing *Del Monte*, 136 F. Supp. 2d at 1292) (emphasis added). Dismissal is only appropriate if the Plaintiff "can establish no facts to support its claim that the information… was indeed a trade secret." *Id.* Here, ADD has properly alleged a trade secret, and Defendants have failed to put forth "clear authority" holding otherwise.

**B.    ADD adequately pled possession of a trade secret.**

"Florida courts adjudicating FUTSA cases have said that the plaintiff is required to identify with reasonable particularity the trade secrets at issue before proceeding with discovery. However, to satisfy this requirement at the dismissal stage in federal court, the plaintiff need only allege sufficient facts to plausibly show a trade secret was involved and to give the defendant notice of the material it claims constituted a trade secret." *DynCorp Int'l v. AAR Airlift Grp., Inc.*, 664 Fed. Appx. 844, 848 (11th Cir. 2016) (internal citations and quotations omitted). *See also Poet Theatricals Marine, LLC v. Celebrity Cruises, Inc.*, 307 So. 3d 927, 929 (Fla. 3d DCA 2020); *Bespoke Studio, Inc. v. Gabbe Private Ltd.,* No. 3:24-cv-121, 2024 WL 4644354, at *5 (N.D. Fla. Aug. 27, 2024) (Wetherell, J.); *Del Monte*, 148 F. Supp. 2d at 1325; *Treco*, 706 F. Supp. 2d at 1286.

ADD has described its trade secrets with reasonable particularity. In addition to the allegations contained within Count III outlined above, ADD pled additional information within its general allegations. Specifically, the complaint alleges that "ADD's proprietary rights in DMV123 include the search data retrieved, display and formatting for inquiries, pricing, and the ADD access procedures among other processes and data." 2d Am. Comp., ¶ 23. The trade secrets alleged to have been obtained by Defendants includes "how the access logs worked and how the ADD DMV123 webservice interacted with users, how the raw data from each state was

parsed and reformatted then displayed in a uniform format across states and what additional data points ADD supplied to each state's inquiry and data feed to make the produce useful in the marketplace, as well as ADD's confidential pricing." *Id.*, ¶ 33. The trade secrets misappropriated also include ADD's "bar code verification system unique to ADD" that "allows tax collectors or users to verify that the data on the inquiry was pulled in real time and not fabricated or 'photo shopped.'" *Id.*, ¶ 34. These allegations describe ADD's trade secrets with "reasonable particularity."

ADD's "unique combination" of public information and unique process of accessing that information is exactly what renders its software/system a trade secret. Contrary to Defendants' assertions, "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination, affords a competitive advantage and is a protectable secret." *Digiport*, 314 So. 3d at 553 (quoting *In re TXCO Res., Inc.*, 475 B.R. 781, 804 (Bankr. W.D. Tex. 2012)). "Accordingly, '[e]ven if *all* of the information is publicly available, a unique compilation of that information, which adds value to the information, also may qualify as a trade secret.'" *Id.* (emphasis added) (quoting *Capital Asset Research Corp. v. Finnegan*, 160 F.3d 683, 686 (11th Cir. 1998)). Here, ADD's "unified process, design, and operation" "parsed and reformatted" the "raw data from each state" to "display [the data] in a uniform format across states" and added "additional

data points" "to each state's inquiry and data feed to make the product useful in the marketplace." 2d Am. Comp., ¶ 33; *Digiport*, 314 So. 3d at 553. ADD's software/system has market value by allowing qualified business entities to quickly access nationwide motor vehicle data via rapid search that they would otherwise have to request individually from each state.[12]

Furthermore, nationwide motor vehicle data is not "readily accessible," because "[u]nder both Federal and State laws, Motor Vehicle Title data, including the owner's address, is confidential private information which can be released only for specific legitimate business purposes as set out in the Driver's Privacy Protection Act, 18 USC section 2721, et. seq." 2d Am. Comp., ¶ 4. At the time the information was accessed by Defendants, they in fact could *not* have accessed the data because they were *not* a qualified agency and had no legitimate business purpose,

---

[12] As the Seventh Circuit observed in *Graczyk v. W. Pub. Co.*, 660 F.3d 275, 280 (7th Cir. 2011), this process can be "so cumbersome" so as to be "virtually impossible":

> As the plaintiffs conceive of the DPPA, each time a person needs information stored in DMV records (for one of the uses listed in section 2721(b)) that person would have to send a request to the DMV for the information. In many cases, this process would be so cumbersome that it would be virtually impossible for ultimate users to take advantage of the exceptions listed in section 2721(b). Many businesses, for example, have "to verify the accuracy of personal information submitted by [an] individual to the business or its agents" on a fairly regular basis. *See Taylor*, 612 F.3d at 338 (noting that credit card companies may approve more than nineteen million credit card applications a year for which they need to verify personal information). If these businesses had to send a request to the DMV every single time they needed to verify an individual's information, the process would become unwieldy for both the companies and the state. We do not interpret statutes to lead to absurdities or to defeat Congressional intent. *City of Chicago v. U.S. Dep't of the Treasury*, 423 F.3d 777, 781 (7th Cir. 2005).

contradicting their assertion that they could have readily obtained the information outside of ADD's system.

In *Managed Care of North America, Inc. v. Florida Healthy Kids Corporation*, a dental program administrator (MCNA) requested a declaratory judgment as to whether its spreadsheets revealing dental providers associated with it and geoaccess maps based on those spreadsheets were trade secrets. 268 So. 3d 856, 858 (Fla. 1st DCA 2019). The excel spreadsheets created by MCNA presented provider information separated into categories. *Id.* at 859. The maps showed where FHKC members were concentrated in relation to the categories included on the excel spreadsheets. *Id.* at 861. In denying declaratory judgment, the trial court reasoned that there was no trade secret provision applicable to the maps because "the geoaccess maps only indicated those providers who could be obtained by the public on MCNA's website or by phone request…" *Id.* The First District Court of Appeal reversed, holding that the trial court erred "in determining that information available to the public can never be considered a protected trade secret. Public information can be subject to trade secret protection, as the time and effort spent compiling and the unique presentation thereof, may render the product a trade secret." *Id.*

> Further, the trial court ignored the uncontroverted testimony of MCNA witnesses explaining that the trade secret nature of the geoaccess maps is independently derived from the unique composition of the maps themselves, not just the underlying information utilized to create the maps. More fundamentally, the trial court wholly ignored the uncontroverted evidence that the geoaccess maps cannot be recreated

using only publicly available information because these maps are generated using proprietary software unavailable to MCNA's competitors. Thus, while some providers' actual locations may be searchable online or by calling MCNA's offices, the unique formatting and display of that information, as compiled and presented by MCNA specifically for FHKC, cannot be replicated without a competitor obtaining MCNA's Florida geoaccess maps from FHKC and reverse engineering its specialized software. MCNA invested significant time, resources and capital in generating a submittal which would be attractive to FHKC. This investment included not only the labor intensive market research necessary to assemble a proffered provider network that would stand out compared to MCNA's competitors, but also the forethought to create a visually appealing compilation and arrangement of the material itself. As such, the geoaccess maps constitute trade secrets wholly exempt from disclosure.

*Id.* at 861-62. [13] *See also Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1291 (11th Cir. 2003) (applying Georgia law; "[E]ven if all the information is publicly available, a unique combination of that information, which adds value to the information, also may qualify as a trade secret."); *Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 189 (1st Cir. 2023) (noting that compilations of publicly-available information may qualify as a trade secret under federal law "when it would have been immensely difficult to collect and compile it in the form in which it appeared in the compilation"); *Digiport*, 314 So. 3d at 553 (elements which by themselves may be readily ascertainable in the public domain may still qualify for trade secret

---

[13]Although the court so decided in the context of whether the information was protected from public records disclosure under the definition of a trade secret contained within section 815.081, Florida Statutes (criminal theft of or trafficking of trade secrets), the definition contained in that section and the definition contained in section 688.002 are substantially the same. *See* Fla. Stat. § 815.081.

protection when viewed together); *La Potencia, LLC v. Chandler*, 733 F. Supp. 3d 1238, 1272 (S.D. Fla. 2024) ("[T]he fact that some of the constituent parts of the information may be publicly available does not negate trade secret protection through compilation.").

Here, the "trade secret nature" of ADD's DMV123 program "is independently derived from the unique composition" of the motor vehicle data itself, and the program "cannot be recreated using only publicly available information because" the data sheet is generated by the DMV123 program "using proprietary software unavailable" to ADD's competitors. *Managed Care*, 268 So. 3d at 861-62. Thus, while some of the motor vehicle data may be obtained by contacting each individual state department of motor vehicles directly, "the unique formatting and display of that information, as compiled and presented" by ADD for its customers "cannot be replicated without a competitor obtaining" access to ADD's DMV123 portal and "reverse engineering its specialized software." *Id.* ADD's investment in the creation of the DMV123 portal included not only the labor-intensive creation of the software to create a product that "would stand out" compared to ADD's competitors, but also "the forethought to create a visually appealing compilation and arrangement of the material itself." *Id. See also Fin. Info. Techs., LLC v. iControl Sys., USA, LLC*, 21 F.4th 1267, 1273 (11th Cir. 2021) ("As a general matter, software source code is not readily ascertainable and, accordingly, qualifies for trade-secret protection."). If

ADD's DMV123 program was not a trade secret and consisted only of "readily accessible" public information, then Defendants would have had no need to unlawfully access DMV123's software in order to reverse engineer and create an identical product.[14]

ADD's program's "real-time access," bar code system, and pricing information is also incorporated into the DMV123 system and entitled to equal protection. While a direct request to each state's department of motor vehicles would allow someone to access some of the information provided within the ADD product, the delay between the request and the fulfillment of that request could lead to the receipt of outdated information, [15] whereas the DMV123 software provides immediate access to these records within seconds and as such the reports generated

---

[14] *Health Care Management Consulting, Inc. v. McCombes* is distinguishable because the party asserting misappropriation of trade secrets was a provider of consulting services to home health care agencies in such areas as Medicare reimbursement and clinical operations. 661 So. 2d 1223, 1224 (Fla. 1st DCA 1995). The "trade secret" sought to be protected was the party's "self-professed confidential methodology of presenting and interpreting Medicare regulations to clients in the home health care industry." *Id.* at 1226. The decision did not recite any other information about what this "confidential methodology" consisted of. *Id.* The party did not assert that it had developed any kind of proprietary system or software interpreting the regulations or the creation of a unique product, as ADD does here. Furthermore, Medicare regulations, which are available to *anyone* online, differ significantly from motor vehicle data that can only legally be obtained for a qualified business use. *Public Systems, Inc. v. Towry,* 587 So. 2d 969, 972 (Ala. 1991), is also distinguishable in that it applied Alabama law, which is "more restrictive than the approach taken by the Restatement or the approach taken by the Uniform [Trade Secrets] Act." Ala. Code § 8-27-2, comment (a)(2).

[15] Some states provide the data in a batch form, which is stale and not provided in "real time" and not in response to the single inquiry.  ADD does not market those states' data as "real time" or "single inquiry".  YASSI, however, markets and advertises all data provided as "real time" despite the fact that such data is only being provided by the state in a batch format.  This misrepresentation forms the basis of the FDUTPA claim and is further discussed in section V below.

Page 30 of 41

by the software are accurate at the time the report is generated—a key feature of ADD's program. Similarly, ADD's bar code verification system, which was independently developed by ADD using ADD's proprietary software, allows the user to quickly and easily validate the data obtained—another feature of ADD's system that would not be known or otherwise available outside of ADD's DMV123 system.

Finally, pricing information, which is *not* publicly available to anyone but ADD's customers, is independently entitled to trade secret protection. "Confidential proprietary data relating to pricing, costs, systems, and methods are protected by trade secret law." *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009). *See also Thomas v. Alloy Fasteners, Inc.*, 664 So. 2d 59, 60 (Fla. 5th DCA 1995) (trade secrets include pricing and profit structure as this type of information "would obviously be important for a competitor in deciding how much it could undercut" the plaintiff's prices); *Lupin Atlantis Holdings SA v. Zeng*, No. 23-61621-CIV, 2024 WL 4491993, at *4 (S.D. Fla. Oct. 15, 2024) ("Courts consistently find that customer lists and pricing information constitute trade secrets.").

Defendants erroneously argue that ADD must plead its trade secrets claim with a particularity that is simply not required by the Federal Rules of Civil Procedure. The decisions cited by the Defendants involve cases at different stages of litigation than this case. *See McCombes*, 661 So. 2d at 1224 (involving temporary

injunction); *Sethscot Collection, Inc. v. Drbul*, 669 So. 2d 1076, 1077 (Fla. 3d DCA 1996) (preliminary injunction); *Templeton v. Creative Loafing Tampa, Inc.*, 552 So. 2d 288, 289 (Fla. 2d DCA 1989) (temporary injunction); *Sea Coast Fire, Inc. v. Triangle Fire, Inc.*, 170 So. 3d 804, 806 (Fla. 3d DCA 2014) (discovery orders); *Public Sys., Inc. v. Tory*, 587 So. 2d 969, 970 (Ala. 1991) (temporary restraining order and preliminary injunction); *Bestechnologies, Inc. v. Trident Envtl. Sys., Inc.*, 681 So. 2d 1175, 1176 (Fla. 2d DCA 1996) (discovery order); *Summitbridge Nat. Invs. LLC v. 1221 Palm Harbor, L.L.C.*, 67 So. 3d 448, 448-49 (Fla. 2d DCA 2011) (discovery order); *Lake Worth Surgical Ctr., Inc. v. Gates*, 266 So. 3d 198, 200 (Fla. 4th DCA 2019) (discovery order); *Lewis Tree Serv., Inc. v. Asplundh Tree Expert, LLC*, 311 So. 3d 206, 208 (Fla. 2d DCA 2020) (discovery order); *Columbia Hosp. (Palm Beaches) Ltd. P'ship v. Hasson*, 33 So. 3d 148, 149 (Fla. 4th DCA 2010) (discovery order). At the motion to dismiss stage, Plaintiff "need only allege sufficient facts to plausibly show a trade secret was involved." *DynCorp*, 664 Fed. Appx. at 848. Whether ADD's system and portions thereof ultimately prove to be trade secrets is not currently a matter for consideration.

## V. ADD ADEQUATELY PLED A CLAIM UNDER THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT.

### A. Rule 9(b) does not apply to ADD's FDUTPA claim.

While it is true that FDUTPA claims sounding in fraud must comply with Federal Rule of Civil Procedure 9(b) and plead "with particularity the circumstances

constituting fraud," *Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1292 (11th Cir. 2025), not all FDUTPA claims are subject to the 9(b) particularity standard. *Lendinara v. Swedish Match N. Am., LLC*, No. 24-61371-CIV, 2025 WL 3699694, at *4 (S.D. Fla. Dec. 15, 2025). *See also Carter v. Ford Motor Co.*, No. 19-62646-CIV, 2021 WL 1165248, at *16 (S.D. Fla. Mar. 26, 2021) ("Rule 9's more stringent standard doesn't apply to *all* FDUTPA claims—only to those that sound in fraud." (emphasis in original)). "If a plaintiff's allegations closely track the elements of common law fraud, then the plaintiff's claim sounds in fraud for purposes of Rule 9(b). If not, then Rule 9(b) does not apply." *Lendinara*, 2025 WL 3699694, at *3 (quoting *Pop*, 145 F.4th at 1294).

A Court must look "to the allegations in the complaint as a whole to determine whether they sound in fraud." *Id.*, n.2. *See also Apex Toxicology, LLC v. United HealthCare Servs., Inc.,* No. 17-61840-CIV, 2020 WL 13551299, at *3 (S.D. Fla. July 7, 2020) ("A claim 'sounds in fraud' when a plaintiff alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of that claim."); *Hill v. Hoover Co.*, 899 F. Supp. 2d 1259, 1263 (N.D. Fla. 2012) (Mickle, J.)  (noting that where claims of fraud and claims based on unfair or unlawful conduct are alleged separately, Rule 9(b) only applies to those claims based on fraudulent conduct).

Here ADD alleges that YASSI engaged in unfair trade practices through misrepresenting and falsely advertising to ADD's customers that YASSI's competing product produces the motor vehicle data contained within its reports in "real-time" from *all* states. "Real time" is a term of art within the industry that is understood to mean "immediate" or within a matter of milliseconds to seconds. Some states do not provide "real time" transfer of the motor vehicle data or require a significant cost increase to provide that data in "real time." Based upon the marketing and sales of YASSI, YASSI is misrepresenting its product as producing "real time" motor vehicle data that is in fact stale.  ADD, however, advises its customers that data from these states is not necessarily up to date at the time the report was requested. *See Terms of Use*. In misrepresenting the nature of its product to authorized business entities under the DPPA, including ADD customers, YASSI has deceptively and unfairly competed in the marketplace in violation of FDUTPA. This misrepresentation lured ADD's customers away. Thus, these allegations are focused on Defendants' unfair competitive trade practices, not fraud, and are alleged separately from ADD's fraudulent misrepresentation claim against Postr and Perine.

In *Lendinara*, the defendant, Swedish Match, designed, manufactured, marketed, advertised, promoted, distributed, and sold ZYN, a nicotine product. 2025 WL 3699694, at *1. A user of ZYN sued Swedish Match under FDUTPA, alleging that it falsely maintained that ZYN was a smokeless nicotine replacement therapy

from cigarettes and falsely maintained that ZYN was "tobacco-free" even though the nicotine in ZYN was derived from tobacco. *Id.* Swedish Match then moved to dismiss the FDUTPA claim, arguing that it should be dismissed because it failed to meet the particularity standard for allegations of fraud contained in Rule 9(b). *Id.*, at \*3. The court disagreed, finding that the plaintiff's allegations—that Swedish Match made a number of misrepresentations and omissions that misled reasonable consumers—did not "substantively track the elements of a claim for common law fraud," but instead, "more closely track[ed] the elements of a FDUTPA claim, which requires (1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages." *Id.*, at \*3-4.

Here, ADD alleges that YASSI (1) deceptively and unfairly misrepresented to qualified business users (towing companies, insurers, dealers, etc.) that data pulled from *all* states was in "real time" (2) which caused these users to switch from Plaintiff's legally compliant system to YASSI's non-compliant system, (3) which caused Plaintiff and its customers harm in that Plaintiff lost profits and YASSI customers did not receive the benefit of their bargain. *See* 2d Am. Comp., ¶¶ 106-108.

> These types of allegations are quintessential FDUTPA claims, an act designed to prohibit unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. The allegations here place the focus on the consumers, who, regardless of Defendants' intention, were misled by Defendants' product. Such allegations, like a FDUTPA claim itself,

sweep far more broadly than the doctrine of fraud or negligent misrepresentation, which asks only whether a representation was technically accurate in all material respects.

*Id.*, at \*4 (quoting *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983 (11th Cir. 2016) and *Hetrick Ideal Image Dev. Corp.*, 372 F. App'x 985, 992 (11th Cir. 2010)). As in *Lendinara*, ADD's claims "sweep far more broadly than the doctrine of fraud or negligent misrepresentation," and thus do not sound in fraud and ADD's claim need not meet the requirements of Rule 9(b).

## B.     ADD properly alleged consumer harm.

ADD alleges that Defendants' unfair trade practices harmed YASSI's customers and ADD. The nature of the parties' customers' businesses involves time-sensitive decisions that rely on having the most up-to-date information. By misrepresenting that YASSI's reports from all state agencies are "real time" when they are not, YASSI's customers are making important decisions with insufficient information and don't even know it. Furthermore, these entities are paying for a product that they would not have purchased but for these misrepresentations. While the specifics of these claims will be determined through discovery, at this stage of the litigation, these allegations are sufficient.

In *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, the claimant, a manufacturer of a surgical robot and associated instruments, designed the instruments in such a way that they would cease to work after a certain number of uses for safety reasons

and instructed hospitals and surgeons that they could not be repaired and needed to be replaced. No. 8:20-cv-2274-VMC-TGW, 2022 WL 3272538, at *1-2 (M.D. Fla. Aug. 10, 2022). A robotics repair company then entered the market and began "repairing" the instruments by overriding the disabling mechanism that engaged after a certain number of uses and told the hospitals that the instruments were safe to use after this "repair." *Id*. The robotics repair company moved for summary judgment on the manufacturer's FDUTPA claim against it, arguing that the manufacturer failed to show that any consumers were actually harmed by the repaired instruments. *Id.*, at *19. The court denied summary judgment, finding that a genuine issue of material fact existed as to whether the robotics repair company's "consumers" (hospitals) were harmed due to their alleged deceptive practices or unfair acts, noting that the Eleventh Circuit has recognized that FDUTPA provides a remedy "where a product or service has been misrepresented and thus deprives the consumer of the benefit of his bargain" and the  manufacturer was proceeding under the theory that the hospitals did not get the benefit of their bargain because the "repaired" machine that they paid for was not as safe, "like new," or approved by the manufacturer, etc., as they believed based on the repair company's marketing. *Id.* (citing *Carriuolo*, 823 F.3d at 986-87). *See also Point Blank Solutions, Inc. v. Toyobo Am., Inc.,* No. 09-61166-CIV, 2011 WL 1833366, at *6 (S.D. Fla. May 13, 2011) (consumers are harmed when they purchased something that was not what

they were led to believe they were purchasing). *Cf. CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*, No. 3:16-cv-186, 2018 WL 905752, at *16 (M.D. Fla. Feb. 15, 2018) (FDUTPA claim dismissed where plaintiff failed to allege that consumers did suffer or were likely to suffer any harm by buying plaintiff's brand name product through an unauthorized distributor).

Based upon the foregoing, the FDUTPA claim should not be dismissed.

## VI.   ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE.

In the majority of cases cited by Defendants where the claims were dismissed at the pleading stage, they were dismissed without prejudice. *See Sekula*, 2016 WL 4272203, at *3 (M.D. Fla. Aug. 15, 2016) (tortious interference); *Coach Servs., Inc. v. 777 Lucky Accessories, Inc.*, 752 F. Supp. 2d 1271, 1272 (S.D. Fla. 2010) (tortious interference); *Al Rushaid*, 159 F.4th at 901 (preemption); *Freedom Mortgage*, 2020 WL 8642053, at *5 (preemption); *Hanaw*, 2014 WL 12606501, at *9 (FDUTPA, tortious interference); *Vape Fiends*, 2017 WL 5953429, at *7 (tortious interference); *Sasowski*, 2021 WL 8363506, at *10 (preemption); *Compton v. Gen. Motors LLC*, No. 1:19-CV-33-AW-GRJ, 2020 WL 13469725, at *4 (N.D. Fla. Mar. 31, 2020) (Winsor, J.) (FDUTPA).

In cases where the claims were dismissed with prejudice at the pleading stage, other circumstances existed that are not present here. *See Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1261 (11th Cir. 2015) (affirming dismissal

with prejudice where plaintiff already had an opportunity to amend the claims after accessing "tens of thousands" of documents in discovery); *Dynasty Mgmt. Group, LLC v. Alsina,* No. 16-20511-CIV, 2017 WL 7345377, at *1 (S.D. Fla. Oct. 3, 2017) (denying request to amend where court issued four previous warnings that the final amended complaint would be plaintiff's last opportunity to state a claim); *Muy v. Int'l Bus. Machines Corp.*, No. 4:19CV14-MW/CAS, 2020 WL 13470560, at *5 (N.D. Fla. Apr. 10, 2020) (Walker, J.)  (dismissing claims with prejudice where plaintiff had two opportunities to amend, and this Court previously and clearly articulated the facts that needed to be alleged in order to avoid dismissal and amended complaint was almost identical to previous complaint). In two cases that were dismissed with prejudice, the dismissal was only on claims which were preempted, and the court did not explain why dismissal with prejudice was appropriate or consider whether an amendment would be futile. *See Measured Wealth Private Client Grp., LLC v. Foster,* No. 20-CV-80148, 2020 WL 3963716 (S.D. Fla. July 13, 2020); *Dev. Techs., LLC v. Valmont Indus., Inc.*, No. 8:14-CV-2796-MSS-JSS, 2016 WL 7320908 (M.D. Fla. July 18, 2016).[16]

As noted above, while ADD has amended the complaint twice, neither of these amendments were made pursuant to a motion to dismiss and thus should more

---

[16] Some courts were silent as to whether the dismissal was with prejudice. *See Coleman*, 232 F. Supp. 2d 1329; *CEMEX*, 2018 WL 905752; *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164 (Fla. 4th DCA 2015).

specificity be needed, the Second Amended Complaint should be dismissed without prejudice. The first amendment was made prior to service of the complaint and essentially corrected some typographical errors and expanded upon the jurisdictional allegations in paragraph 10. The Second Amended Complaint was prepared after discussions with Defendants' counsel. Specifically, defense counsel had asked that ADD more specifically articulate what claims were being incorporated into the civil conspiracy count to allow Defendants to be able to answer or address that count. Thus, ADD accommodated that request to hopefully provide the additional details that Defendants were seeking and avoid the need for a motion to dismiss. Defendants at that time did not raise any other issues with the First Amended Complaint and no other significant changes were made. As Defendants have not specifically moved to dismiss Count II for the alleged failure to properly specify the torts that Defendants conspired to commit, ADD presumably cured Defendant's concern on this issue.

Regardless of the foregoing, should this Court find that additional specificity is required with regards to Plaintiff's claims, Plaintiff respectfully requests that any dismissal be without prejudice.

Respectfully submitted this 31st day of March, 2026.

s/Robert Scott Cox
Robert Cox, Esq.
Attorney for Plaintiff.

Florida Bar #286362
Talley Kaleko, Esq.
Florida Bar #487155
Law Offices of Robert Scott
Cox PL
122 South Calhoun St
Tallahassee, FL 32301-1518
Office: 850-577-0296
Fax:   850-561-0206
Service E-mail:
robert@robertcoxlaw.com
talley@your2nchair.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to all attorneys of record.

Respectfully submitted,


s/Robert Scott Cox
Robert Cox, Esq.
Attorney for Plaintiff.
Florida Bar #286362
Talley Kaleko, Esq.
Florida Bar #487155